```
 1  ANDRÉ BIROTTE JR.
    United States Attorney
 2  ROBERT E. DUGDALE
    Assistant United States Attorney
 3  Chief, Criminal Division
    JAMES M. LEFT (Cal. SBN: 173382)
 4  Special Assistant United States Attorney
    General Crimes Section
 5       1200 United States Courthouse
         312 North Spring Street
 6       Los Angeles, California 90012
         Telephone: (213) 894-0511
 7       Facsimile: (213) 894-0141
         Email: jim.left@usdoj.gov
 8
    Attorneys for Plaintiff
 9  United States of America

10                  UNITED STATES DISTRICT COURT
11              FOR THE CENTRAL DISTRICT OF CALIFORNIA
12
13  UNITED STATES OF AMERICA,     )  CR No. 11-436(A)-MRW
                                  )
14            Plaintiff,          )  GOVERNMENT'S SUPPLEMENT TO ITS
                                  )  OPPOSITION TO DEFENDANTS'
15       v.                       )  MOTION TO SUPPRESS EVIDENCE;
                                  )  DECLARATIONS; EXHIBIT J
16  HUGO RENE BAQUIAX,            )
    JOEL CIRILO SOSA HERNANDEZ,   )  STATUS CONFERENCE:
17                                )  November 1, 2011, at 11:00 a.m.
              Defendants.         )
18                                )
                                  )
19                                )
                                  )
20                                )
21  _____
22       Plaintiff United States of America, by and through its
23  counsel of record, the United States Attorney for the Central
24  District of California, hereby files a supplement to its
25  opposition to defendants' motion to suppress evidence.
26  //
27  //
28
```

The government's supplement and opposition are based upon the attached memorandum of points and authorities, the files and records in this case, the attached declarations and exhibit, and any other evidence or argument that the Court may wish to consider during the next scheduled hearing.

DATED: October 18, 2011          Respectfully submitted,

ANDRÉ BIROTTE JR.
United States Attorney

ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division


_____/s/_____
JAMES M. LEFT
Special Assistant United States Attorney

Attorneys for Plaintiff
United States of America

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### INTRODUCTION

Defendants HUGO RENE BAQUIAX ("BAQUIAX") and JOEL CIRILO SOSA HERNANDEZ ("SOSA") filed a motion to suppress evidence that the Los Angeles Police Department ("LAPD") seized from the 907 Club during the execution of a search warrant on November 5, 2010. The government filed an opposition, which included Exhibits A to I. On October 3, 2011, the Court denied defendants' motion on the ground that defendants failed to establish that they had standing to challenge the search warrant. However, the Court allowed defendants the opportunity to submit declarations in support of their motion.

On October 11, 2011, defendant SOSA submitted a declaration in which defendant SOSA asserted that only he and the three other managers of the club had keys and access to the two offices from which documents and a computer were seized. (Declaration of Sosa Hernandez at 3). Defendant SOSA claimed that the doors to these offices remained closed and locked during business hours. (Id.). Defendant also claims that employees who were not managers "were not permitted access to the business office[s]." (Id.). Defendant further claimed that only the managers had access to the filing cabinets in the offices where were the documents were kept. (Id.).

//
//

1

## II.

## TESTIMONY AND EVIDENCE THAT CONTRADICTS DEFENDANT SOSA'S DECLARATION

Defendant SOSA's declaration is inconsistent with the testimony of defendant BAQUIAX made in support of the motion to suppress. On October 3, 2011, defendant BAQUIAX testified that all four managers *and* the two owners of the 907 Club had keys and access to the offices, not just the managers.

Other portions of defendant SOSA's declaration are inconsistent with the recollections of some of the female employees of the 907 Club. Specifically, the four women provided declarations.[1] These women indicate that the two offices at the 907 Club were not locked and secured at all times. Specifically, all four women went to the office used by SOSA to pick up their paychecks. (Declaration of Garcia Guzman at 1; Declaration of Guzman Villapando at 1; Declaration of Romero Sosa at 1; Declaration of Valdez Olivares at 1). Laura Lizeth Garcia Guzman states that sometimes the door to this office was ajar, and at the other times, the door was closed but unlocked. (Declaration of Garcia Guzman at 1). Zinthia Nayeli Romero Sosa states that the door to SOSA's office was always unlocked. (Declaration of Romero Sosa at 1). Olga Yesenia Valdez Olivares states that the door to this office was sometimes unlocked. (Declaration of

---

[1] All four women are unlawfully present in the United States. (Declaration of Porter at 4). U.S. Immigration and Customs Enforcement ("ICE") is allowing these women to remain in the United States, and ICE has provided them with work authorization. (Id.). With the exception of Laura Guzman Villalpando, LAPD arrested these women on November 5, 2010, on charges related to the possession of false identification documents, and they were convicted of these offenses. (Id.).

2

Valdez Olivares at 1).

Guzman Garcia states that generally, the door to the second office was usually locked, but she once went to the office when the door was open. (Declaration of Garcia Guzman at 1). Guzman Garcia also stated that the other managers used this office when defendant BAQUIAX was not on duty. (Id.). Romero Sosa and Valdez Olivares believe that the door to this office was always locked. (Declaration of Romero Sosa at 1; Declaration of Valdez Olivares at 1).

Romero Sosa also states that the strippers who participated in the "Bikini Girls Show" used both offices to change their clothes. (Declaration of Romero Sosa at 1-2). All four women state that customers entered the office that Sosa used. (Declaration of Garcia Guzman at 2; Declaration of Guzman Villapando at 1; Declaration of Romero Sosa at 2; Declaration of Valdez Olivares at 2). Sometimes, the customers went there when the door was opened. (Declaration of Romero Sosa at 2; Declaration of Valdez Olivares at 2).

Defendant SOSA's declaration is also inconsistent with the undercover videos related to this case. The third recording concerns the Confidential Informant's ("CI") meeting with defendant SOSA on September 20, 2010. (Declaration of Porter at 2). The video shows that the filing cabinets inside one of the offices were left open. (Id.). Background noises clearly indicate that SOSA did not lock the office door after SOSA and the CI entered the office, because at one point, one can hear the

3

door opening and closing.² (Id. at 3). Later in the same video, an unknown woman is sitting on the couch in the office, which indicates that this woman opened the unlocked door and entered the office. (Id.).

The fourth recording depicts another meeting between the CI and defendant SOSA on October 25, 2010. (Id. at 3). This meeting took place in an office at the 907 Club, and the office door was not locked. (Id.). In fact, on two occasions, the video shows that the door as being ajar. (Id.).

## III.

### STATEMENT OF LAW

As previously stated in the government's opposition to the motion to suppress, whether a person has a reasonable expectation of privacy in his work place must be analyzed on a case by case basis as there are a "great variety of work environments." United States v. SDI Future Health, Inc., 568 F.3d 684, 695 (9th Cir. 2009). An individual may assert standing for an office for which the individual has exclusive use and for other areas upon considering the following factors:

> (1) whether the item seized is personal property or otherwise kept in a private place separate from other work-related material; (2) whether the defendant had custody or immediate control of the item when officers seized it; and (3) whether the defendant took precautions on his own behalf to secure the place searched or things seized from any interference without his authorization.

Id. at 698 (footnotes omitted). Without a personal connection or

---

² The voices in the videos are mostly in Spanish, and there is no need to consider any of the actual conversations at this time. Only the visual depictions need to be considered. The only audio portion of the recordings that needs to be considered is the sounds of the office door opening and closing.

4

exclusive use, a defendant cannot establish standing to challenge the search of a workplace.  Id.

There has been no allegation by either defendant that the LAPD seized their personal property.  Defendants also failed to establish that they had exclusive use over the offices.  As defendant BAQUIAX testified, the owners of the 907 Club had access to the offices, and the four managers shared the offices.  The statements of the four former employees of the club indicate that none of the managers had exclusive use and control over either office.  Furthermore, the undercover videos show that the door to one office was not locked at all times and that the managers did not take any steps to secure the contents of the filing cabinets in this office.

Given the foregoing, despite the submission of the declaration from defendant SOSA, defendants still fail to establish that they had exclusive use of the offices at the 907 Club and that they had exclusive control over the documents contained in the offices.  Thus, defendants again have failed to establish that they have standing to challenge the LAPD search warrant.

//
//

IV.

CONCLUSION

For the reasons stated above and for the reasons stated in the opposition to the motion to suppress, the government respectfully requests that the Court reaffirm its denial of defendants' motion to suppress on the ground that defendants lack standing. The government also continues to assert that in the alternative, the Court should deny the motion to suppress for the other reasons stated in the opposition to the motion to suppress.

DATED: October 18, 2011          Respectfully submitted,

                                 ANDRÉ BIROTTE JR.
                                 United States Attorney

                                 ROBERT E. DUGDALE
                                 Assistant United States Attorney
                                 Chief, Criminal Division


                                 _____/s/_____
                                 JAMES M. LEFT
                                 Special Assistant United States
                                 Attorney

                                 Attorneys for Plaintiff
                                 United States of America

## DECLARATION OF LAURA LIZETH GARCIA GUZMAN

1. I was hired to worked at the 907 Club in January 2007, and I worked there until November 5, 2010. During this time, I worked under the name "Rebeca Tostado," and I was employed as a dance hostess. My shift was initially from 6:00 p.m. to 2:00 a.m., but usually I started earlier. I later changed my hours to 12:00 p.m. to 6:00 p.m. Most days, I worked the same shifts as my mother, Laura Guzman Villalpando.

2. There were two offices inside the 907 Club, and they were next to each other. Hugo Baquiax used both offices. Baquiax primarily used the office that contained the safes. Every once in awhile, the other managers used that office when Baquiax was not on duty. Joel Sosa, Jose Quiroz, and Fernanda Herrera used the other office.

3. I had been inside Sosa's office on many occasions. I picked up my paycheck by going that office. I also went there to ask permission to miss work for a day. Other women also went there to pick up their paychecks. When I went to receive my paycheck, sometimes the door was ajar, and other times, it was closed. When the door was closed, sometimes it was locked.

4. I only went to Baquiax's office on two occasions. One occasion, I went to the office to ask about my work outfit. I only stood by the door. When I got to the door, it was closed, and it was probably locked. I had to knock on the door. On the other occasions, I went inside the office to speak to Baquiax. The door was open, and then Baquiax got up to close it. If no one was in the office, Baquiax kept the door locked. On some occasions, I noticed that female employees knocked before

entering, but the door was unlocked.  On other occasions, Baquiax had to unlock the door for the women to enter.

5.   Sometimes, I saw the customers of the club go into the office that Sosa and the other managers used.  The customers went there when they could not pay their bills.  I do not remember whether the door was open or closed when the customers went to that office.

I hereby certify under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: October 18, 2011

_____
Laura Lizeth Garcia Guzman

## DECLARATION OF LAURA GUZMAN VILLALPANDO

1. I worked at the 907 Club from about January 2007 to November 2010. From 2007 to 2009, I worked under the name "Leticia Brito." In 2009 and 2010, I worked at the club under my own name. From 2007 to 2010, I was employed as a dance hostess. Initially, my shift was from 6:00 p.m. to 2:00 a.m. I later changed my hours to 12:00 p.m. to 6:00 p.m.

2. There were two offices inside the 907 Club, and they were next to each other. Hugo Baquiax used both offices, but only Baquiax and the owner, Michelle Hutchinson, had access to one office. Joel Sosa, Jose Quiroz, Fernanda Herrera, and "Patty," the cashier, used the other office.

3. I had been inside Sosa's office on many occasions to pick up my paychecks and to request permission to miss work or leave early. I also went to that office when I had a complaint about a client. Other women also went there to pick up their paychecks. When I went to Sosa's office, the door was locked.

4. I only went to Baquiax's office on three or four occasions. On two occasions, I went to that office to pick up a paycheck. Another time, I went there to speak to Baquiax about my work outfit. Another time, I went there to ask for time off from work. Each time, I had to knock on the door, because the door was closed. I do not know if it was locked. There were filing cabinets with drawers in Baquiax's office.

5. Sometimes, I saw the customers of the club go into the office that Sosa and the other managers used. The customers went there when they had complaints. The customers knocked before entering, and they entered after the person inside gave

1

1  permission.  At times, the office door was locked, and at other
2  times, it was unlocked.
3      I hereby certify under penalty of perjury that the foregoing
4  is true and correct to the best of my knowledge and belief.

6  Dated: October 18, 2011                    _____
                                              Laura Guzman Villalpando

### DECLARATION OF ZINTHIA NAYELI ROMERO SOSA

1. I worked at the 907 Club for about one week in February 2009. I also worked at the club for about two months until November 5, 2010. During that time, I was employed as a dance hostess. I usually worked the day shift from 12:00 p.m. to 6:00 p.m. However, I worked the night shift on November 5, 2010.

2. There were two offices inside the 907 Club, and they were next to each other. Hugo Baquiax primarily used one office that was always locked. Joel Sosa, Jose Quiroz, and Fernanda Herrera used the other office.

3. I had been inside Sosa's office several times to pick up my paycheck. Other times, I went to that office when I had a complaint. Other women also went there to pick up their paychecks and for other reasons. Every time I went to that office, it was unlocked. Each time I went to the office, it was before 6:00 p.m.

4. I only went to Baquiax's office on two occasions. One time, I went to that office because there was a problem with my paycheck. I had to knock on the door, because the door was locked, and Baquiax was inside and on the phone. On another occasion, I went to Baquiax's office, because I requested permission to leave early. I had to knock on the door this time as well. To my knowledge, Baquiax's office was always locked. I do not remember if there were filing cabinets in Baquiax's office.

5. On November 5, 2010, I saw the strippers who participated in the "Bikini Girls Show," which took place on Friday nights. On that night, I saw them go into Sosa's office

1

to change their clothes. At that time, the office door was open. Also, other women who worked at the club told me that the strippers used both offices to change their clothes.

6. Sometimes, I saw the customers of the club go into the office that Sosa used. I do not know why they went there. At times, I saw that the door was opened, and it was closed after the customers entered the office.

I hereby certify under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: October 18, 2011                     */s/ Zinthia Romero*
                                            Zinthia Nayeli Romero Sosa

2

**DECLARATION OF OLGA YESENIA VALDEZ OLIVARES**

1.    I was hired to work at the 907 Club in 2004. I stopped working at the club on four occasions, and I was rehired four times. Following the last time that I was rehired, I worked at the club until November 5, 2010. During my periods of employment, I was employed as a dance hostess. For some shifts, I worked from 1:00 p.m. to 10:00 p.m. During other shifts, I worked from 1:00 p.m. to 12:00 a.m. or 2:00 a.m.

2.    There were two offices inside the 907 Club, and they were next to each other. Hugo Baquiax used both offices, and Joel Sosa only had access the one office. Jose Quiroz and Fernanda Herrera used the same office as Sosa.

3.    I had been inside Sosa's office on many occasions. I picked up my paycheck every week by going that office. Other women also went there to pick up their paychecks. When the other women and I went to receive our checks, the door to the office remained unlocked. On other occasions, the door was locked, and a manager was inside.

4.    I only went to Baquiax's office on two occasions. One time, I went to that office, because there was a problem with my check. I had to knock on the door, because the door was locked and Baquiax was inside. On another occasion, I went to Baquiax's office, because I requested permission to leave early. To my knowledge, Baquiax's office was always locked. There may have been filing cabinets in Baquiax's office, but I am not certain.

5.    During both times that I was inside Baquiax's office, I noticed that the owner, Michelle Hutchinson, had put out a

display in the office.  This display contained jewelry that Hutchinson sold to the women who worked at the club.

6. Sometimes, I saw the customers of the club go into the office that Sosa and the other managers used.  The customers went there when they had complaints.  Sometimes, the door was open when the customers went to speak with a manager.

I hereby certify under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: October 18, 2011

_____
Olga Yesenia Valdez Olivares

2

## DECLARATION OF CRAIG PORTER

1. I am a Special Agent ("SA") with the United States Department of Homeland Security ("DHS"), U.S. Immigration and Customs Enforcement ("ICE"). I am assigned to the Work Site Enforcement Unit of the Los Angeles district office. I am the lead case agent concerning the case involving the 907 Club, which was a "hostess club" in downtown Los Angeles. Customers paid to talk and dance with the club's hostesses, many of whom were illegal aliens. Defendants BAQUIAX and SOSA were two of the managers at the club.

2. As part of ICE's investigation into the 907 Club, on multiple occasions, I sent a female Confidential Informant ("CI") to the 907 Club. On four occasions, the CI went to the club with a video and audio recorder hidden inside of a purse. On each occasion, I gave the purse and recording equipment to the CI. Also on each occasion, the CI immediately returned these items to me after she left the club. I have reviewed all four videos, which depict, in pertinent part, the following.

3. On September 8, 2010, I sent the CI to seek employment at the 907 Club. At about 7 minutes and 7 seconds into the first video recording, Fernanda Herrera, an assistant manager, opens the door to one of the offices inside the club. (Exhibit J, recording 1). Just before then, it appears that Herrera is holding a set of keys, but I could not determine if she used a key to open the door. Herrera then turns on the lights to the office. Both Herrera and the CI then sit down with a desk in between them.

4.      At about 7 minutes and 17 seconds into the recording, and during other times, the video clearly shows that the filing cabinet doors are open.  At about 12 minutes and 12 seconds into the recording, Herrera turns off the lights, opens the door, and leaves the office.  The CI also leaves the office.  There is no indication as to whether Herrera locked the office door.

5.      On September 10, 2010, I sent the CI to work at the 907 Club.  As displayed in this video, the CI spoke with a security guard outside of the club and then returned to my location. (Exhibit J, recording 2).  The CI informed me that once she started working, she could not leave the club.  Thus, the CI was sent back to the club again to work without the recording equipment.

6.      On September 20, 2010, I instructed the CI to go to the 907 Club to pick up her paycheck.  The CI went to the club, and this was recorded.  (Exhibit J, recording 3).  At that time, the CI met with defendant SOSA.  At about 4 minutes and 30 seconds into the recording, Sosa opened the door to the office.  A paper in SOSA's left hand blocked the view of the door as he opened it, and thus, I could not determine whether SOSA used a key to open the door.

7.      At about 5 minutes and 24 seconds into the third video and at other times, the left door of the filing cabinet is depicted, and it is clearly open.  At about 12 minutes and 27 seconds into the video, paperwork is clearly visible on the lower shelf of the left side of the cabinet.  At about 13 minutes and 25 seconds into the video, the right side of the cabinet is visible, and it is clearly open.

2

8. Background noises clearly indicate that SOSA did not lock the office door after SOSA and the CI entered the office. At about 12 minutes and 57 seconds, I could hear a door opening and closing. At about 13 minutes and 27 minutes, the video depicts an unknown woman sitting on the couch in the office. Based upon this information, I believe that this woman opened the unlocked door, entered the office, and then sat down on the couch.

9. On October 25, 2010, I again asked the CI to seek employment at the 907 Club. The CI again went to the club with the undercover recording device. (Exhibit J, recording 4). At about 6 minutes and 4 seconds into the video, the CI is inside the club and reaches for the office door. At the same time, defendant SOSA opens the door from the inside and lets the CI come in. At about 6 minutes and 8 seconds into the video, the CI closes the office door. As reflected below, the door was not locked.

10. At about 7 minutes and 53 seconds into the fourth video, I clearly saw that there were no filing cabinets against the wall behind the desk, as depicted in the prior videos. At about 7 minutes and 57 seconds, the video depicts the office door as being ajar and then closing, possibly by someone outside the office. At about 13 minutes and 33 seconds, the video again depicts the office door as being ajar. At about 13 minutes and 44 seconds, the CI leaves the office, and it is not unknown whether the office door is closed behind her.

11. I am also familiar with the four other declarants, Laura Lizeth Garcia Guzman, Laura Guzman Villalpando, Zinthia

Nayezi Romero Sosa, and Olga Yesenia Valdez Olivares.  All four women are unlawfully present in the United States.  ICE is allowing these women to remain in the United States, and ICE has provided them with work authorization.  With the exception of Laura Guzman Villalpando, LAPD arrested these women on November 5, 2010, on charges related to the possession of false identification documents, and they were convicted of these offenses.

    I hereby certify under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: October 18, 2011

_____
Craig Porter

4